479 F.2d 960
 5 Fair Empl.Prac.Cas. 934,
6 Fair Empl.Prac.Cas. 464,
5 Empl. Prac. Dec. P 8563,
6 Empl. Prac. Dec. P 8782
Willie L. MORROW and Jerome Mangum, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants-Cross Appellees,
v.
Giles W. CRISLER, Commissioner of Public Safety of
Mississippi, et al., Defendants-Appellees-Cross Appellants.
 No. 72-1136.
 United States Court of Appeals,
Fifth Circuit.
 April 18, 1973.
Rehearing and Rehearing En Banc Granted Aug. 6, 1973.
 
 Frank R. Parker, Constance Iona Slaughter, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for plaintiffs-appellants.
 William A. Allain, First Asst. Atty. Gen., P. Roger Googe, Jr., Special Asst. Atty. Gen., Charles A. Marx, Heber Ladner, Jr., Jackson, Miss., for defendants-appellees.
 David L. Rose, Chief, William B. Fenton, Employment Section, Dept. of Justice, Civil Rights Div., Washington, D. C., amicus curiae.
 Before BELL, GOLDBERG and RONEY, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 This is a civil rights suit involving racial discrimination in employment and working conditions in the Mississippi Highway Safety Patrol. The District Court entered a declaratory and injunctive decree in favor of the plaintiffs who appeal on the ground that they were not accorded sufficient relief by the Court. The defendants cross-appeal. We affirm.
 
 
 2
 The defendants' cross-appeal is without merit. The population of the State of Mississippi was 36.7% black according to the 1970 Census. The Mississippi Highway Patrol has never in its history employed a member of the Negro race as a sworn officer. As of April 15, 1971, of the 27 bureaus within the Department of Public Safety, only two, the Maintenance Bureau and the Training Academy, had any black employees and these consisted of cooks and janitors. The employees of all other bureaus within the Department, including clerical and secretarial personnel and sworn officers, were white. Of the Department's 743 employees, only 17 are black. Since January 1, 1968, 197 persons, all white, have been hired as Mississippi Highway Patrolmen. The evidence presented in this case amply supports the District Court's conclusion that the policies and practices of the defendants constitute a pattern and practice of racial discrimination in hiring and employment in violation of the Fourteenth Amendment to the United States Constitution and that plaintiffs are entitled to injunctive relief.
 
 
 3
 This brings us to the plaintiffs' appeal. The District Court entered a declaratory and injunctive decree, attached in full as an appendix, which declared the right of the plaintiffs and the members of the plaintiff class to be treated equally without racial discrimination, and enjoined the defendants from (1) racial discrimination in the distribution, receipt, and processing of all applications for employment within the Department of Public Safety; (2) from continuing, maintaining or instituting any of nine specified racially discriminatory practices, including the requirement of passing a standardized general intelligence test or the Otis Quick Mental Scoring Test or any other tests which have neither been validated nor proved to be significantly related to successful job performance; (3) from applying for the next five years any standards or conditions of employment more stringent than those previously applied that would make it more difficult for future employees to be hired; (4) from giving preference to applicants who have relatives in the Department; (5) from using recruiting films which imply that responsible positions are open to or held by whites only; and requiring defendants to (6) conduct an affirmative recruiting program oriented to the black population; (7) comply with Departmental Rules and Regulations prohibiting the use of any racial terms and epithets which are humiliating, derogatory, and insulting to anyone because of their race, color, creed, or national origin; (8) maintain records and make reports as to the race of all applicants, employees, hirings, promotions, demotions, and discharges for a three to five year period.
 
 
 4
 The Court specifically denied the individual plaintiffs the relief of hiring, training, and back pay, and denied the affirmative relief of requiring the defendants to increase the number of black officers by minority preference on a racial quota system, to the end that the percentage of blacks on the Patrol does not significantly differ from the percentage of blacks in the population of the State of Mississippi.
 
 
 5
 The question before us is whether the District Court was required to afford the affirmative relief as a matter of law.
 
 Relief as to Individuals
 
 6
 The decision as to whether the individual plaintiffs were legally entitled to affirmative relief turns on whether or not the Court was clearly erroneous in finding that at the time that plaintiffs sought application forms in June, 1970, they were denied the requested forms because of an employment freeze or embargo caused by budgetary problems and were not denied these forms because of their race. The plaintiffs argue that once it was determined defendants were guilty of a pattern and practice of racial discrimination in hiring and employment practices, the defendants must show by clear and convincing evidence that the action was taken for other than racial reasons. The plaintiffs argue that the findings of the Court are not insulated from a full review by the clearly erroneous standard because the Court applied the wrong legal standard. This argument is not without some difficulty. We think, however, that the plaintiffs misconceive the force of their figures. Once the state proved that there was an embargo on hiring at the time the plaintiffs sought to apply, i. e., that no one was hired, black or white, because of budgetary reasons, then the prima facie case of discrimination fades for that period of time. The essence of the case is whether the plaintiffs did not get jobs because of their race. The court having determined that no one got jobs during the period involved simply means that the plaintiffs would not have gotten the jobs had they been white. This being the case, they cannot now obtain employment, back pay, and other benefits as if they would have received jobs, but for their race. The evidence concerning the embargo was conflicting, but once the credibility choices were resolved by the District Court, we cannot hold that the Court's decision was clearly erroneous. The plaintiffs were told to return for applications in September, 1970, at which time the embargo would be lifted. They did not do this, even though advised by an attorney to do so. The evidence is not sufficient to conclude that they would now be working for the Department had they been white, which would seem to be a since qua non for the relief they request.
 
 The Class Relief
 
 7
 The question here is whether the District Court granted sufficient equitable relief to eliminate the discriminatory effects of the past as well as to bar like discrimination in the future. If it did not, it abused its discretion, and the case would be remanded for the entry of appropriate relief.
 
 
 8
 The appellants argue that the relief granted was insufficient for two reasons: first, the Court should have ordered affirmative hiring relief for minority persons as a class, through either minority preference in hiring or quota hiring, and second, the Court should have enjoined the administration of unvalidated employment tests.
 
 
 9
 We do not reach the question as to whether it would have been within the Court's discretion to order relief of this kind. We merely decide that, under the facts and circumstances as shown by the record in this case, the failure to fashion relief along these lines was not an abuse of discretion.
 
 
 10
 The approach to the review of orders of District Courts in granting relief in cases involving racial discrimination in public hiring is not unlike that referred to by the Supreme Court in Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970):
 
 
 11
 "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
 
 
 12
 'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. Hecht Co. v. Bowles, 321 U.S. 321, 329-330 [64 S.Ct. 587, 592, 88 L.Ed. 754] (1944), cited in Brown II [Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)]'. . . .
 
 
 13
 In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults."
 
 
 14
 402 U.S. at 15-16, 91 S.Ct. at 1276. See Smith v. Young Men's Christian Ass'n of Montgomery, 462 F.2d 634, 649 (5th Cir. 1972).
 
 
 15
 We are met with this obstacle to the argument that the Court did not require enough: there is no showing in this record that the relief it granted will not remedy the wrong. There is no evidence in the record from which to infer the percentage of the hired employees of the Highway Patrol that be white and the percentage that would be black, but for racial discrimination. There is no evidence that the enforced recruiting measures ordered by the District Court will not be sufficient to assure all interested members of the minority class that they will be hired by the Department, if qualified. There is no evidence that the present qualifications need be changed in order to open the doors to black applicants.
 
 
 16
 The State argues first, that quotabased relief would exceed the needs made out by the statistics in this case and would constitute an unconstitutional preference, and second, that the finding that the Otis Test was unvalidated is incorrect, arguing that the test has been ruled by this Circuit to be validated as a matter of law.
 
 
 17
 Because of the ground of our decision, we do not decide the merits of the legal arguments of either party. We decide that there is not sufficient proof in this record to hold that the District Court abused its discretion in the relief that was ordered, or in the failure to order all of the relief requested. Time may prove that the District Court was wrong, i. e., that the relief ordered was not sufficient to achieve a nondiscriminatory system and eliminate the effects of past discrimination. But until the affirmative relief the District Court has ordered has been given a chance to work, we cannot tell. There is no way that this Court can determine that the relief the Court ordered will not achieve the remedy to which the plaintiffs are entitled.
 
 
 18
 We cannot say, assuming the constitutionality of quota-based relief, a point that deserves serious consideration but which we do not reach, that such relief exceeds the needs of the situation.
 
 
 19
 It was not an abuse of discretion to order the discontinuance of one test and substitute another which the District Court concluded would serve to eliminate the discriminatory hiring practices.
 
 
 20
 All parties, both representatives of the plaintiffs' class and the defendants, must work diligently toward producing qualified black candidates with which to break the mold of discrimination. From the view of an appellate court, we cannot now say that this will not be adequately accomplished by the present decree. The Court has retained jurisdiction to make the decree work. If it has ordered too much, it may modify the decree when it appears necessary. If it has not ordered enough, it may change the decree to require such additional relief as it determines to be necessary to remedy the wrong. There are no experts in the solution of problems created by racial prejudice. The eventual test of the remedial power of the District Court must lie in its reasonableness and in its workability. As Chief Justice Burger said in Swann:
 
 
 21
 "The Court of Appeals, searching for a term to define the equitable remedial power of the district courts, used the term 'reasonableness.' In Green, supra [Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716], this Court used the term 'feasible' and by implication, 'workable,' 'effective,' and 'realistic' in the mandate to develop 'a plan that promises realistically to work, and . . . to work now.' On the facts of this case, we are unable to conclude that the order of the District Court is not reasonable, feasible and workable. However, in seeking to define the scope of remedial power or the limits on remedial power of courts in an area as sensitive as we deal with here, words are poor instruments to convey the sense of basic fairness inherent in equity. Substance, not semantics, must govern, and we have sought to suggest the nature of limitations without frustrating the appropriate scope of equity."
 
 
 22
 402 U.S. at 31, 91 S.Ct. at 1283.
 
 
 23
 Like Swann, we cannot here determine that the order of the District Court is not a reasonable, feasible, and workable use of the Court's remedial power to make sure that never again will a person otherwise qualified for employment with the Highway Patrol be refused a job because of his or her race.
 
 
 24
 Affirmed.
 
 APPENDIX
 
 25
 JUDGMENT AND ORDER FOR DECLARATORY AND INJUNCTIVE RELIEF
 
 
 26
 (Number and title omitted)
 
 
 27
 (Filed: Oct. 18, 1971)
 
 
 28
 This action having come on for final hearing before Honorable Walter L. Nixon, Jr., United States District Judge, on June 28 and 29, 1971, and the issues having been duly heard, and a decision having been duly rendered on September 29, 1971,
 
 
 29
 It is, therefore, in accordance with the Court's decision of September 29, 1971, ORDERED, ADJUDGED AND DECREED:
 
 
 30
 A. Declaratory Relief. The Court declares that the plaintiffs and the members of the plaintiff class, defined as all qualified Negroes who have applied or will apply in the future for employment with the Mississippi Department of Public Safety and/or the Mississippi Highway Safety Patrol, all present Negro employees of the Department and the Patrol, and all future employees of the Department and the Patrol, have a right secured by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. Secs. 1981 and 1983 to be free from racially discriminatory employment practices of the defendants and have a right secured by the Constitution and laws of the United States to be free of any policy, practice, custom, or usage of the defendants or their successors in office of denying, abridging, withholding, conditioning, limiting or otherwise interfering with the rights of plaintiffs and the plaintiff class to enjoy equal employment opportunity in hiring, training, assignment, transfers, promotion, retention in employment and other terms and conditions of employment without discrimination on the basis of race, color, creed or national origin.
 
 
 31
 B. Injunctive Relief. The defendants herein, Governor John Bell Williams, Governor of Mississippi, Giles W. Crisler, Commissioner of Public Safety, J. D. Gardner, Chief of Patrol of the Mississippi Highway Safety Patrol, and Charles E. Snodgrass, Personnel Director of the Department of Public Safety, their officers, agents, servants, employees, attorneys, and successors in office and those persons in active concert and participation with them, are hereby enjoined and restrained as follows:
 
 
 32
 1. From discriminating against plaintiffs or the class that they represent in the distribution, receipt and processing of all applications within the Department of Public Safety and within the Mississippi Highway Safety Patrol as sworn officers, clerical help, secretaries and all other employment positions, and no other individual shall be subjected to any racially discriminatory employment practice with the purpose of denying, abridging, withholding, conditioning, or otherwise interfering with the rights of applicants and employees of the Department to enjoy equal employment opportunity in hiring, training, assignment, and transfers, promotion and retention in employment and other terms and conditions of employment without discrimination on the basis of race, color, creed or national origin. To this extent, the June 30, 1971 memorandum from the defendant, Commissioner Giles W. Crisler to Charles E. Snodgrass and department heads of the Department of Public Safety in this regard, attached to the "Chronicle of Post-Trial Events" as Exhibit "A", and attached herein as Exhibit 1, shall be and shall remain in effect and be complied with in the future and to that extent so much of said memorandum shall be implemented pursuant to the Decree of this Court.
 
 
 33
 2. From continuing, maintaining or instituting any of the following racially discriminatory practices:
 
 
 34
 (a) failing and refusing to permit the applicants to apply for positions with the Department of Public Safety solely because of race or color, creed or national origin;
 
 
 35
 (b) requiring applicants for patrolmen positions as a condition to consideration for employment, to pass a standardized general intelligence test or the Otis Quick Mental Scoring Test or any other tests which have not been validated nor proved to be significantly related to successful job performance. To this end, all applicants for positions in the Department of Public Safety and the Highway Safety Patrol shall in the future be required to comply with the regulations adopted by the Classification Commission of the State of Mississippi established by the legislative Act found in Section 8935-14, Mississippi Code of 1942, as Recompiled and Amended, which covers all agencies including the Highway Patrol. All of the defendants and their successors in office in the Department and Patrol are hereby required to comply with the regulations adopted by the Classification Commission, including the giving of examinations which are standard nationally approved tests that are administered in an objective manner;
 
 
 36
 (c) applying to applicants for patrolmen positions, as a condition of hiring, vague and undefined subjective standards which may be used as a means of discriminating on the basis of race, color, creed or national origin without objective verification;
 
 
 37
 (d) failing and refusing to hire and train applicants for staff positions with the Department of Public Safety solely because of their race, color, creed or national origin;
 
 
 38
 (e) maintaining any departments, divisions and/or bureaus within the Department of Public Safety for Whites only;
 
 
 39
 (f) maintaining certain jobs and job categories within the Department of Public Safety for Whites only and others for Negroes only;
 
 
 40
 (g) failing and refusing to promote employees to positions of higher responsibility and benefits or to supervisory positions solely because of their race, color, creed or national origin;
 
 
 41
 (h) maintaining any physical facilities segregated on the basis of race or color; and
 
 
 42
 (i) otherwise applying terms and conditions of employment within the Department of Public Safety in a racially discriminatory manner.
 
 
 43
 3. From applying as a condition of employment, for the next five years from the date of this Decree, any new standards or qualifications for applicants more stringent than those applied, as a matter of practice, to employees hired since June 1, 1968, so that it will not be more difficult for future employees, blacks and whites, to be hired than it was for those employees hired since June 1, 1968.
 
 
 44
 4. From using application forms which ask questions or contain any information regarding the relatives, friends, and/or acquaintances of employees of the State of Mississippi, or the Department of Public Safety or the Mississippi Highway Patrol, and from providing or exhibiting any preference or favoritism toward any applicant for any position with the Department of Patrol because he has a relative, friend, or acquaintance employed by the State of Mississippi, or by the Department of Public Safety or the Highway Safety Patrol.
 
 
 45
 5. From showing or in any way utilizing any motion picture film including the film "Law Enforcement Officers' Training Academy" already barred by the Commissioner, or other similar visual aid to promote recruitment which emphasizes or implies that responsible positions or any other positions within the Department or Patrol are open to or held by whites only.
 
 
 46
 6. The defendants and their successors in office shall give all notices of and conduct all mental tests for examinations in conformance with the rules and regulations of the Mississippi Classification Commission. If those rules or regulations do not provide otherwise, the defendants shall for a period of at least three months prior to the convening of each Patrol Recruit Training Class and at least thirty days prior to the filling of vacancies in other positions in the Department, advertise in newspapers and on radio and television throughout the State, including those particularly oriented to and providing maximum coverage to the black population, that applications are being received for patrolmen positions, or that vacancies exist for other positions in the Department, prominently indicating in each instance that applications will be received and considered without regard to race, color, creed or national origin; and shall also specify the exact mechanics and procedures to be followed in applying. All applications received within 45 days of the first publication of the above reference announcement shall be processed in the same manner as directed above and all applicants found to be qualified will be considered with all applicants who have previously qualified. Those applications received after the 45 days will be held and processed for the next scheduled class. However, positions on the Patrol and in other bureaus of the Department may be filled without advertising on a temporary basis to fill emergency needs. Copies of all such advertising, names of news media employed, and the dates of such advertising shall be kept in a permanent file by the Departmental custodian of records, open to public inspection at all reasonable times.
 
 
 47
 7. Any visits for purposes of recruitment by any employees of the Department of Public Safety and/or the Mississippi Highway Safety Patrol or by anyone else for the purpose of securing employees for the Department or Patrol to colleges, churches, civic clubs, etc. shall be done in such a manner as to achieve maximum coverage to potential applicants or employees on a nondiscriminatory basis, such recruitment efforts to be made at as many predominantly black colleges, junior colleges and high schools within the state as nearly as feasible and practicable.
 
 
 48
 8. To comply with Addendum I-A to the Departmental Rules and Regulations, Public Relations, attached as Exhibit "C" to the "Chronicle of Post-Trial Events" filed by the plaintiffs, and attached herein as Exhibit 2, with reference to restrictions and prohibitions of the use of any racial terms and epithets which are humiliating, derogatory and insulting to anyone because of their race, color, creed or national origin.
 
 
 49
 9. To make the following reports and maintain the following records:
 
 
 50
 (a) Records showing the name, address, race and date of application and disposition of the application of each person applying for or seeking an application for any position with the Department or Patrol and retain each such application form for a period of three years from the date of this Decree, and such records shall be public records in the office of the defendants subject to review, inspection and copying during regular business hours, in a manner which does not unduly interfere with the conduct of normal business.
 
 
 51
 (b) The defendants and their successors in office shall also maintain a public record during the next five years from the date of this Decree listing the name, race, position and pay rate of all employees of the Department of Public Safety and the Highway Safety Patrol, and especially showing which employees have been newly hired, promoted, demoted and discharged during this reporting period.
 
 
 52
 C. Plaintiffs' request for specific relief, including an injunction requiring the defendants to hire and train them for positions for which they sought application forms in June, 1970, and back pay and other benefits lost as a result of defendants' refusal to provide them with application forms in June, 1970, is hereby denied, except that the plaintiffs are entitled to the protection of the injunctive relief as stated above.
 
 
 53
 D. Plaintiffs' request for such affirmative relief as would require the defendants to increase the number of black officers on the Mississippi Highway Patrol, by minority preference or a racial quota system, to the end that the percentage of blacks on the Patrol does not significantly differ from the percentage of blacks in the population of the State of Mississippi, is hereby denied.
 
 
 54
 F. All taxable court costs herein are taxed against the defendants, and defendants are hereby ordered to pay to plaintiffs attorney's fees in the amount of $500.00.
 
 
 55
 G. This Court shall retain jurisdiction of this action to enforce compliance with its Decree entered herein and for any further action as may be necessary.
 
 
 56
 H. The defendants are hereby ordered to post or cause to be posted this Judgment and Order for Declaratory and Injunctive Relief on regular informational bulletin boards in all Patrol and Department installations throughout this State, including their Jackson Headquarters, for a period of 30 days immediately after entry of this Decree, and the defendants and their successors in office are hereby ordered to instruct each division and bureau chief of the Department of Public Safety to instruct all employees under their supervision to familiarize themselves with the terms of this Court's Decree.
 
 
 57
 I. The Clerk is directed to mail by certified mail, return receipt requested, a certified copy of this Judgment and Order for Declaratory and Injunctive Relief to each of the parties, by their attorneys, and such mailing shall constitute notice to the plaintiffs and the defendants and their successors in office of the terms of the Judgment and Order.
 
 
 58
 ORDERED, ADJUDGED, AND DECREED on this the 14th day of October, 1971.
 
 
 59
 /s/ Walter L. Nixon, Jr.
 
 UNITED STATES
 DISTRICT JUDGE
 
 60
 GOLDBERG, Circuit Judge (concurring in part and dissenting in part):
 
 
 61
 I concur in the Court's opinion insofar as it affirms the district court's finding of class discrimination. From that part of the Court's opinion that denies any affirmative hiring relief to the class, I must, with profound sorrow, dissent.
 
 
 62
 As the majority recognizes, despite a state population that was 42% Black in 1960 and 36.7% Black in 1970, "the Mississippi Highway Patrol has never in its history employed a member of the Negro Race as a sworn officer." The district court and the majority agree that this racial void was the result of "racially discriminatory policies and practices of the defendants" and that such policies and practices are violative of the Fourteenth Amendment. In fashioning relief, however, the district court refused to order any affirmative hiring relief, and it did so without any explanation for its inaction.[1]
 
 
 63
 The barriers to black entry into the Highway Patrol that defendants erected and tolerated have been formidable. The district court found, inter alia:
 
 
 64
 1. "Neither the Department of Public Safety nor the Highway Safety Patrol does any public advertising or makes any public announcements when job vacancies become available. Most of the patrolmen presently employed by the Patrol learned of vacancies and the fact that applications were being accepted through word-of-mouth inquiry from patrolmen who are their friends or relatives, and the majority of the clerical positions in the Department are filled by walk-ins, many of whom are recommended by present employees."
 
 
 65
 2. "The employment application forms utilized by the Department and the Patrol require an applicant to list his relative employed by the State of Mississippi and his friends or acquaintances employed by the Patrol. Of the 107 Whites hired as patrolmen since January 1, 1968, all but twelve listed friends or acquaintances employed by the Patrol, and forty-two listed relatives employed by the State of Mississippi. Although there are communication media in the State of Mississippi, including television, radio and newspapers which reach a large portion of the Black community, neither the Department nor the Patrol has advertised the availability of jobs in any of these media or in any other news media in the State of Mississippi. The officers of the Public Relations Bureau of the Department present recruitment programs, including speeches, to civic clubs, church groups and student groups throughout the state. Included in those programs are presentations on "the law enforcement profession" which includes a description of the employment opportunities and qualifications for positions with the Department and the Patrol. The audiences for such programs have been predominantly White. A color motion picture film, apparently produced prior to January 1, 1968, which shows the physical plant and training operations of the Training Academy, has been available at the Patrol's public relations bureau and has been shown to groups of students as part of "career day" programs in school in the State. In this film, which at the time of the time of trial of this case had been ordered by Commissioner Crisler not to be shown again, all of the recruits, officers, instructors, Academy personnel and other persons are White, with the exception of Black cooks and food servers in the cafeteria."
 
 
 66
 3. "Until shortly before the trial of this case, the Department had no written rules or regulations prohibiting the use of racial terms or epithets by patrolmen, and the term "nigger" had at times been used by patrolmen in addressing Blacks."
 
 
 67
 4. "The Mississippi Department of Public Safety and the Mississippi Highway Safety Patrol have had a reputation throughout the State of Mississippi, and particularly among the Black communities, as being an all-White Department and Patrol, which has discouraged Blacks, with the exception of the two named plaintiffs, Coker, and probably only a few others, from applying for membership, particularly as sworn officers of the Patrol, by virtue of the fact that there have never been any Black sworn officers on the Patrol. This in part has resulted from the fact that the application forms provide for a listing of relatives employed by the State of Mississippi and friends and acquaintances on the Patrol and within the Department of Public Safety, the former being all-White and the latter being almost all-White. Favoritism and partiality has been shown to those applicants having relatives, friends and acquaintances on the all-White Patrol."
 
 
 68
 Although there is a hint of some progress during the last two years, the conclusion seems inescapable that the Patrol's past discriminatory practices have left a legacy whereby Mississippi Blacks could have little, if any, reason to believe they would be accepted for employment on the Patrol. See, United States v. Jacksonville Terminal Co., 5 Cir. 1971, 451 F.2d 418, 457-458. In short it is impossible to believe that an injunctive order that does little more than require defendants to "stop discriminating" will result in the effective remedial vindication of the rights found violated here. In the words of Justice Holmes, "upon this point a page of history is worth a volume of logic." New York Trust Co. v. Eisner, 1921, 256 U.S. 345, 349, 41 S. Ct. 506, 507, 65 L.Ed. 963.
 
 
 69
 Both plaintiffs and the United States Department of Justice, as amicus curiae, have prayed for this Court to mandate some form of affirmative hiring relief. I believe the Department of Justice has succinctly and correctly stated in its brief the primary issue before us on this appeal:
 
 
 70
 "Whether the district court, after holding that defendants were engaged in a pattern and practice of racial discrimination and finding that the defendants' 'all-white' reputation among black citizens in Mississippi has discouraged blacks from applying, erred in failing to order an affirmative minority hiring goal to correct the effects of past discrimination by the defendants and their predecessors."
 
 
 71
 From my reading of the district court's findings and the record in this case, I am thoroughly convinced that the relief granted by the district court and affirmed by the majority is wholly inadequate to remedy the constitutional deprivations alleged and proven by plaintiffs.
 
 
 72
 This Court has long recognized that in cases of employment discrimination it is often necessary to order affirmative relief in order to insure that the effects of the past discrimination are overcome. In Local 53 of the International Assoc. of Heat & Frost Insulator & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047, an employment discrimination case granting broad affirmative relief, Judge Dyer stated:
 
 
 73
 "In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to 'order such affirmative action as may be appropriate.' See United States v. Louisiana, E.D.La.1963, 225 F.Supp. 353, 393, aff'd, 1965, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709."
 
 
 74
 407 F.2d at 1052. See also United States v. Jacksonville Terminal Co., supra, 451 F.2d 418, 455, 458; United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906 at 927.[2]
 
 
 75
 This well established concept of affirmative relief, commonly applied in all areas of racial discrimination is not, as defendants claim, creating some new form of invidious discrimination in favor of Blacks. Rather, it is a recognition of the fact that to simply order an end to discrimination is often inadequate-more is required to right the past wrongs effectively. The notion of "transitional protective measures," which requires a temporary suspension of traditional requirements of "color blindness," have been authoritatively accepted, if not required, as a means of achieving benign constitutional objectives.
 
 
 76
 "As we have stated often before, federal courts have an affirmative duty to order broad remedial relief where necessary to correct the effects of a pattern and practice of racial discrimination. Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709; Adams v. Miami Police Benevolent Ass'n, Inc., supra; Local 53 of International Association of Heat & Frost Insulators & Asbestos Workers v. Vogler, 5 Cir. 1969, 407 F.2d 1047; United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836."
 
 
 77
 Smith v. Young Men's Christian Ass'n of Montgomery, 5 Cir. 1972, 462 F.2d 634, 649. See also Swann v. Charlotte-Mecklenburg Bd. of Educ., supra; Long v. Georgia Kraft Co., 5 Cir. 1972, 455 F.2d 331.
 
 
 78
 In requiring affirmative hiring relief, we would not be saying that Blacks must forever be favored over Whites. We would simply say that unless some transitional affirmative relief is required, the severe constitutional deprivations that have already occurred will never be remedied. As Chief Justice Burger makes clear in Swann, supra, 402 U.S. at 31-32, 91 S.Ct. 1267, affirmative transitional measures are necessary only until past vestiges of discrimination have been removed. Where the vestiges of past discrimination are as obvious and extensive as in the instant case, I would read Swann as saying that not only is affirmative relief permissible, but that it is also required.
 
 
 79
 In a recent case that is strikingly similar to the case sub judice, the Eighth Circuit, sitting en banc, ordered the Minneapolis Fire Department to hire Blacks on a one to two basis until an appropriate number of qualified Blacks had been hired. Carter v. Gallagher, 8 Cir. 1971, 452 F.2d 315. As is our case, Carter was based on 42 U.S.C. Secs. 1981 and 1983, and the court there used the Title VII cases as authority for the proposition that transitional affirmative relief was both appropriate and necessary. In modifying the district court's order, the Eighth Circuit stated:
 
 
 80
 "The absolute preference ordered by the trial court would operate as a present infringement on those non-minority group persons who are equally or superiorly qualified for the fire fighter's positions; and we hesitate to advocate implementation of one constitutional guarantee by the outright denial of another. Yet we acknowledge the legitimacy of erasing the effects of past racially discriminatory practices. Louisiana v. United States, supra. To accommodate these conflicting considerations, we think some reasonable ratio for hiring minority persons who can qualify under the revised qualification standards is in order for a limited period of time, or until there is a fair approximation of minority representation consistent with the population mix in the area. Such a procedure does not constitute a "quota" system because as soon as the trial court's order is fully implemented, all hirings will be on a racially nondiscriminatory basis, and it could well be that many more minority persons or less, as compared to the population at large, over a long period of time would apply and qualify for the positions. However, as a method of presently eliminating the effects of past racial discriminatory practices and in making meaningful in the immediate future the constitutional guarantees against racial discrimination, more than a token representation should be afforded. For these reasons we believe the trial court is possessed of the authority to order the hiring of 20 qualified minority persons, but this should be done without denying the constitutional rights of others by granting an absolute preference."
 
 
 81
 Carter v. Gallagher, supra, 452 F.2d at 330-331. It is instructive to note that in Carter the Blacks constituted a considerably smaller percentage of the general population (approximately 4%) and that the stigma of discrimination that emanated from the Minneapolis Fire Department did not approach the level of the all-white legacy of the Mississippi Highway Patrol. Nonetheless, a majority of that Circuit recognized the appropriateness of ordering affirmative hiring relief.
 
 
 82
 Similarly, in Castro v. Beecher, 1 Cir. 1972, 459 F.2d 725, the First Circuit modified a district court order upon finding that certain preferential hiring relief was necessary in order to alleviate the past discriminatory practices of the Massachusetts Police:
 
 
 83
 "As to the class now before us, those black and Spanish-surnamed applicants who failed one or more of the examinations given during the period from 1968 to 1970, we feel that some form of compensatory relief is mandated. See, e.g., Carter v. Gallagher, supra, 452 F.2d at 328-331. We recognize that any such effort is bound to be a crude one and must be pursued with sensitivity and restraint. The district court has ordered that a nondiscriminatory and job predictive test be developed. In our view, if relief in the near future is to be more than token, further provision is necessary."
 
 
 84
 459 F.2d at 736-737. The Court suggested the use of priority pools and hiring by ratio as appropriate remedial measures. Id. at 737. There are countless other cases that have required considerably broader affirmative relief than that accorded here. E.g., United States v. Hayes International Corp., 5 Cir. 1972, 456 F.2d 112, 117; United States v. Ironworkers Local 86, 9 Cir. 1971, 443 F.2d 544, cert. denied, 404 U.S. 484, 92 S.Ct. 447, 30 L.Ed.2d 367; United States v. St. Louis-San Francisco Ry. Co., 8 Cir. 1972, 464 F.2d 301.
 
 
 85
 The blatant statistical evidence and the long undeviating policy of discrimination, when combined with the important public character of the Highway Patrol, create a need for affirmative relief that is equal to if not greater than that present in many earlier employment discrimination cases. Today's decision affirming the denial of affirmative relief is, in my opinion, an unfortunate step backward in the fight for racial equality.
 
 
 86
 The majority, while recognizing the gross effects of the past discrimination, studiously avoid the issue of the propriety of ordering affirmative relief by adopting an attitude of appellate deference that is unprecedented in this Circuit in the civil rights area. The two cases cited by the majority, Swann and Smith, do indeed say that the district court has broad discretion in fashioning appropriate remedies for racial discrimination. Both of these cases, however, affirmed district court decisions that had ordered broad affirmative relief. The deference that was being paid on appeal-rejecting claims that the relief had been too extensive-was that the precise contours of affirmative relief are best left to the district court. See also Adams v. Miami Police Benevolent Ass'n, Inc., 5 Cir. 1972, 454 F.2d 1315. They should not be read as holding that the question of affirmative relief vel non is purely a matter of district court discretion.
 
 
 87
 While it is certainly axiomatic that the trial court traditionally exercises broad discretion over the details of injunctive relief, where, as here, there is a constitutional deprivation proven and found but not remedied, I believe the "chancellor's foot" must defer to the need for effective constitutional vindication. As we have only too often experienced in cases of racial discrimination, the nature of the remedy is often the only relevant substantive issue at stake, and to permit broad notions of "discretion" to supplant our duty to insure effective relief is an unfortunate abdication.
 
 
 88
 The unfairness and unfeasibility of the majority's opinion is well illustrated by a resent case, with almost identical facts, where the federal district court in Alabama ordered broad affirmative hiring relief in favor of black plaintiffs who had suffered identical hiring discrimination at the hands of the Alabama State Troopers, N.A.A.C.P. v. Allen, M. D.Ala., 1972, 340 F.Supp. 703.[3] The sharp contrast of that relief with the lack of affirmative relief granted below in this case is all too clear. The difference can hardly be attributed to minute differences in the facts of the cases, and it is apparent to me that in the Alabama case the plaintiffs were victorious and here the victory is one in form only. This disparity in substantive relief, presumably perfectly acceptable under the deferential approach taken by the majority, has the effect of allowing important constitutional rights to hinge solely on the length of the "chancellor's foot." I am unable to accept such a result.
 
 
 89
 In United States v. Hayes International Co., 5 Cir. 1969, 415 F.2d 1038, this Court reversed a district court's denial of a preliminary injunction and ordered affirmative relief for black plaintiffs. Judge Tuttle stated:
 
 
 90
 "It is true that this court has followed the view that an injunction does not follow as a matter of course upon either a finding or stipulation of violation of some Act of Congress. Mitchell v. Ballenger Paving Company, Inc., 299 F.2d 297, 300 (5th Cir., 1962). However, it is equally true that this court has consistently held that the decision of the lower court is subject to review and where it is clear that its discretion has not been exercised with an eye to the purpose of the Act, Wirtz v. B. B. Saxon Company, 365 F.2d 457, 462 (5th Cir., 1966); Shultz v. Parke, 413 F.2d 1364 (5th Cir., 1969), or exercised in light of the objective of the act, Mitchell v. Ballenger Paving Company, Inc., supra, we have nevertheless not hesitated to reverse an order of the trial court denying an injunction without the need of a discussion of abuse and discretion."
 
 
 91
 415 F.2d at 1044-1045. The Court went on to say
 
 
 92
 "Moreover, we hold as did the court in Vogler v. McCarty, Inc., 294 F. Supp. 368, 372 (E.D.La.1967) affirmed 407 F.2d 1047 (5th Cir., 1969) that where an employer has engaged in a pattern and practice of discrimination on account of race, etc., in order to insure the full enjoyment of the rights protected by Title VII of the 1964 Civil Rights Act, affirmative and mandatory preliminary relief is required."
 
 
 93
 Id. at 1045. More recently, in broadening the injunctive relief granted by a district court, Judge Tuttle stated:
 
 
 94
 "Full enjoyment of Title VII rights sometimes requires that the court remedy the present effects of past discrimination. See Louisiana v. United States, 380 U.S. 145, 154 [85 S.Ct. 817, 13 L.Ed.2d 709] (1965). This includes both redressing the continuing effects of discriminatory seniority systems, Local 189, United Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969); United States v. Jacksonville Terminal Co., supra; United States v. Hayes International Corp., supra, and affirmative action to alter a seniority system which is not discriminatory on its face. If the present seniority system in fact operates to lock in the effects of past discrimination, it is subject to judicial alteration under Title VII. Local 53, International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1052 (5th Cir. 1969); Local 189, supra at 991, of 416 F.2d."
 
 
 95
 United States v. Georgia Power Co., supra at 927.
 
 
 96
 Finally, the approach of a unanimous Supreme Court in a civil rights case in which the defendants argued that the district court's equitable discretion should not be disturbed, is instructive:
 
 
 97
 "Since the city has completely failed to demonstrate any compelling or convincing reason requiring further delay in implementing the constitutional proscription of segregation of publicly owned or operated recreational facilities there is no cause whatsoever to depart from the generally operative and here clearly controlling principle that constitutional rights are to be promptly vindicated. The continued denial to petitioners of the use of city facilities solely because of their race is without warrant. Under the facts in this case, the District Court's undoubted discretion in the fashioning and timing of equitable relief was not called into play; rather, affirmative judicial action was required to vindicate plain and present constitutional rights. Today, no less than 50 years ago, the solution to the problems growing out of race relations 'cannot be promoted by depriving citizens of their constitutional rights and privileges,' Buchanan v. Warley, supra (245 U.S. 60, at 80, 81, 38 S.Ct. 16, at 20, 62 L.Ed. 149)."
 
 
 98
 Watson v. Memphis, 1963, 373 U.S. 526, 539, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529.
 
 
 99
 The majority states the issue sub judice as being "whether the District Court granted sufficient equitable relief to eliminate the discriminatory effects of the past as well as to bar like discrimination in the future." It is perfectly clear to me that the district court did not grant "sufficient equitable relief." I cannot agree with the majority's statement that "there is no showing in this record that the relief granted will not remedy the wrong." Where the effects of past discrimination have been as devastating and socially significant as in this case, I am unaware of any precedent for placing this sort of burden on a plaintiff who has successfully proven a violation of constitutional rights and is seeking appropriate relief. In a recent case, E.E.O.C. v. Rogers Bros., Inc., 5 Cir. 1972, 470 F.2d 965, Chief Judge Brown vacated a district court order in a Title VII case that had failed to give adequate injunctive relief, and spoke to this problem:
 
 
 100
 "While this record contains abundant evidence that the defendants have consistently declined in the past to submit the required reports, we are unwilling to make the initial forecast of what their course may be in the future. Nevertheless, we may hold on these facts that injunctive relief is mandatory unless the District Court finds on the basis of clear and convincing proof that there exists no reasonable probability of further non-compliance with the reporting provisions of the Act. United States v. Edwards, supra [United States v. Edwards, 5 Cir., 1964, 333 F.2d 575]. The burden of negating that probability lies with the defendants, and in these circumstances it will be a monumental one."
 
 
 101
 470 F.2d at 966-967. See also Cooper v. Allen, 5 Cir. 1972, 467 F.2d 836, 840 (burden of clear and convincing proof on employer). In any event, the statement in the majority that "if it [the district court] has ordered too much, it may modify the decree when it appears necessary," (emphasis added) only underscores the sharp disagreement I have with the majority's perception of the case.
 
 
 102
 The approach taken by the majority-if this fails to work we can always try a little more, or presumably, a little less, in the future-fails to give the relief consistently vouchsafed by this Court's approach to civil rights matters over the last decade. In school cases we have ordered integration now, e. g., Davis v. Bd. of School Comm'rs., 1971, 402 U.S. 33, 38, 91 S.Ct. 1289, 28 L.Ed. 2d 577. We have ordered broad affirmative relief in cases involving housing discrimination, see e. g., United States v. West Peachtree Tenth Corp., 5 Cir. 1971, 437 F.2d 221, 228-229, voting rights, Louisiana v. United States, supra, and most importantly we have always required effective and non-dilatory affirmative remedies in cases of employment discrimination. The order affirmed by the majority does not obligate the defendants to hire any Blacks. It ignores the long history of discrimination that will invariably operate as a strong deterrent to black interest in the Patrol. For the district court to withhold affirmative hiring relief in a case with such important constitutional rights at stake is without question an abuse of discretion.
 
 
 103
 Recognizing the primacy of the district court's role in fashioning equitable relief, the proper result here would have been to remand the case to have the district court, in the first instance, fashion appropriate affirmative hiring relief that would be both immediate and meaningful. The possible alternatives are broad-temporary one-to-one hiring, the creation of priority hiring pools, a freeze on white hiring until the Patrol is effectively integrated, or any other form of affirmative hiring obligation-but to place the defendants under no obligation whatsoever, as was done here, is clearly insufficient. I emphasize that the affirmative relief would be on a transitional basis and would be operative only until the barriers, both real and psychological, are removed. The Patrol would not have to "lower" its hiring standards, and the court could not order the employment of genuinely unqualified Blacks. But the record makes clear that there are qualified Blacks, willing and able to be employed, and the court's order should have required the hiring of at least some Blacks.
 
 
 104
 In order to overcome the still present badges of slavery, badges of freedom must now be festooned on the uniforms of some Blacks, even if those badges be as symbols of real and genuine equality to come. The Constitution generally commands in the present tense and is not stilled by pious hopes for future days of freedom. Appellate courts rightly give much latitude and longitude to the trial courts' exercise of discretion, but here we see only immobility after years of circumventing the latitudinal and longitudinal geodetics of our revered Constitution.
 
 
 105
 It is statistically inconceivable that in 1973 no Black in Mississippi could be found willing and capable of becoming a patrolman. We should not be blinded by the words of promise for tomorrow, even though they be in injunctive terms. Today is the day for action, but the court below, in its "discretion," did not even put a time limit, much less any firm obligation on the defendants, to end the continued desecration of the Constitution.
 
 
 106
 Even if the relief be de minimis, let there be some light shone on the roadway to constitutional equality. Even momentary tokenism is preferable to absolute negation, and the latter is all that I find in the ordering words of the trial court. It is a sad, sad day indeed for the Blacks of Mississippi to be told that in some glimmering future hour tests will be devised and methods will be achieved whereby they will be accorded some degree of the equality that the Constitution has guaranteed to them since the tragic days of the Civil War.
 
 
 107
 The majority opinion addresses itself exclusively to the future, as though some doctrine of condonation or purging is effected by an injunctive order in futuro that promises to conform some day to constitutional standards. This is too little and too late. We are under a judicial demarche to begin now to unbind the chains of slavery. It is insufficient to leave it to a locksmith in some unforeseen tomorrow to fashion a key to unlock the chain. The chain must be sundered today-nothing less than today can satisfy our duty to cure the stultifying past. Believing that we should remand the case for further consideration of affirmative hiring relief, I dissent.
 
 
 108
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 109
 Before JOHN R. BROWN, Chief Judge and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM, and RONEY, Circuit Judges.
 
 BY THE COURT:
 
 110
 A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,
 
 
 111
 It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.
 
 
 
 [1]
 The district court's entire recital on this point was:
 "D. Plaintiffs' request for such affirmative relief as would require the defendants to increase the number of black officers on the Mississippi Highway Patrol, by minority preference or a racial quota system, to the end that the percentage of blacks on the Patrol does not significantly differ from the percentage of blacks in the population of the State of Mississippi, is hereby denied."
 
 
 [2]
 Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965): "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." See also Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)
 
 
 [3]
 Judge Johnson, in Allen, correctly stated the duty of the district court as follows:
 "Under such circumstances as exist in these cases, the courts have the authority and the duty not only to order an end to discriminatory practices, but also to correct and eliminate the present effects of past discrimination. Hutchins v. United States Industries, Inc., 428 F.2d 303, 310 (5th Cir. 1970); Local 53, Asbestos Workers v. Vogler, 407 F. 2d 1047, 1052 (5th Cir. 1969). The racial discrimination in this instance has so permeated the Department of Public Safety's employment policies that both mandatory and prohibitory injunctive relief are necessary to end these discriminatory practices and to make some substantial progress toward eliminating their effects."
 
 
 [340]
 F.Supp. at 705-706. Included, inter alia, in the injunctive order were the following provisions:
 "III. It is further ordered that the defendants be and they are each hereby enjoined from failing to hire and permanently employ after the probationary period, one Negro trooper for each white trooper hired until approximately twenty-five (25) percent of the Alabama state trooper force is comprised of Negroes. This injunction applies to the cadet and auxiliary troopers as well as to the regular troopers. It shall be the responsibility of the Department of Public Safety and the Personnel Department to find and hire the necessary qualified black troopers.
 "IV. It is further ordered that the defendants be and they are hereby enjoined from conducting any training courses for the purpose of training new troopers until the groups to be given said training courses are comprised of approximately twenty-five (25) percent black trooper candidates.
 "V. It is further ordered that the defendants be and they are each hereby permanently enjoined from failing to hire supporting personnel for the Department of Public Safety in the ratio of one Negro for each white until approximately twenty-five (25) percent of the supporting personnel are black. The decree in United States v. Frazer, 317 F.Supp. 1079 (M.D.Ala.1970) is hereby amended insofar as the Department of Public Safety's employment practices are concerned."
 Id. at 706.