580 F.2d 1284
 18 Fair Empl.Prac.Cas. 119, 18 Empl. Prac.
Dec. P 8645
Willie L. MORROW and Jerome Mangum, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants Cross-Appellees,
v.
W. O. DILLARD, Commissioner of Public Safety of Mississippi,
et al., Defendants-Appellees Cross-Appellants.
 No. 76-2882.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 29, 1978.
 
 Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Isaiah Madison, James M. Abram, Jackson, Miss., for plaintiffs-appellants cross-appellees.
 A. F. Summer, Atty. Gen., William A. Allain, Asst. Atty. Gen., Peter M. Stockett, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants-appellees cross-appellants.
 Appeals from the United States District Court for the Southern District of Mississippi.
 Before COLEMAN, SIMPSON and TJOFLAT, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 For the third time this Court is confronted with a civil rights class action challenging the racially discriminatory hiring policies of the Mississippi Highway Safety Patrol ("Patrol") and the Mississippi Department of Public Safety ("Department"). There are three questions presented on this appeal: (1) Whether the District Court, acting pursuant to the mandate of a prior En banc decision of this Court, abused its discretion or imposed an unconstitutional hiring preference by ordering that the Patrol and Department, when hiring future employees or officers, temporarily be required to offer appointment first to every black applicant who meets the minimal qualifications determined to be valid by the District Court; (2) Whether the plaintiffs, as prevailing parties, are entitled to recover reasonable attorney's fees under the Civil Rights Attorney's Fee Awards Act of 1976 from state officers irrespective of the Eleventh Amendment to the United States Constitution; and (3) Whether the doctrine of "law of the case" precludes our consideration of either or both these issues?
 
 
 2
 The facts of this case are reported in two prior opinions, Morrow v. Crisler, 479 F.2d 960 (5th Cir. 1973), Aff'd in part, rev'd and remanded in part, 491 F.2d 1053 (5th Cir.), (en banc), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). Nevertheless, this appeal requires consideration of the District Court's post-remand opinion, Morrow v. Dillard, 412 F.Supp. 494 (S.D.Miss.1976), as well as those controlling facts set forth in our prior opinions. For the sake of brevity, however, we will briefly set the stage, identify the protagonists, and delineate their respective contentions, leaving a more detailed examination of the facts to our substantive discussion below.
 
 I. STATEMENT OF FACTS
 
 3
 Appellants, plaintiffs in the action below, are two blacks who had unsuccessfully sought employment applications for positions with the Patrol. They instituted a class action against the Governor of the State of Mississippi, the Commissioner of Public Safety, the Chief of the Mississippi Highway Patrol, and the Personnel Officer of the Department of Public Safety. The class representatives alleged[1] that the racially discriminatory employment practices of the defendants violated their rights and the rights of the plaintiff class, consisting of all present and future black applicants and employees, as secured by 42 U.S.C. §§ 1981[2] and 1983,[3] Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[4] and the Fourteenth Amendment to the United States Constitution. The District Court held[5] that the statistical evidence adduced by plaintiffs revealed racially discriminatory hiring policies, constituting a pattern and practice of racial discrimination, albeit unintentional, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1981 and 1983. Morrow v. Crisler, 4 Empl.Prac.Dec. (CCH) P 7563, at 5242 (S.D.Miss.1971); Memorandum Opinion, (R. 451-52). Plaintiffs had requested that as a remedy defendants be required to increase the number of black officers on the Patrol by minority preference or racial quota. Although denying this affirmative hiring relief, the District Court did enter a declaratory and injunctive decree. In addition to declaring the right of the plaintiffs and plaintiff class to be treated equally and without racial discrimination, the court enjoined the defendants from engaging in specified acts[6] and required the defendants to conduct an affirmative recruiting program oriented toward the black population.[7]
 
 
 4
 All taxable costs were taxed against defendants. Without furnishing any explicit reasons, the District Court also ordered defendants to pay plaintiffs' attorney's fees.
 
 
 5
 In the first appeal presented to this Court, the original panel held, per Judge Roney, that "(t)he evidence presented in this case amply supports the District Court's conclusion that the policies and practices of the defendants constitute a practice and pattern of racial discrimination in violation of the Fourteenth Amendment to the United States Constitution and that plaintiffs are entitled to injunctive relief." Morrow v. Crisler, 479 F.2d 960, 962 (5th Cir. 1973). With regard to the affirmative hiring relief sought by plaintiffs, the Court held that the District Court had not abused its discretion in fashioning the equitable relief it decreed. Although the Court noted that time might prove it wrong, it found the relief ordered was not insufficient to achieve a nondiscriminatory system and eliminate the effects of past discrimination. 479 F.2d at 964.
 
 
 6
 On rehearing En banc, this Court said that "(t)here being no question that the Highway Patrol has historically engaged in unconstitutional discrimination in the employment of patrolmen, the only question that brought this case En banc is whether the District Court ordered sufficient affirmative relief to eradicate the State's unconstitutional employment practices and their effects." Morrow v. Crisler, 491 F.2d 1053, 1055 (5th Cir.), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974). The En banc Court held that the relief ordered by the District Court was insufficient and remanded the case to the District Court to order some "form of affirmative hiring relief until the Patrol is effectively integrated." 491 F.2d at 1055-56. With regard to the issue of attorney's fees, the En banc Court said that the "District Court shall reconsider the award of the Amount of attorney's fees, and shall award such fees as may be appropriate for this appeal and further proceedings." Id. at 1057 (emphasis added).
 
 
 7
 On remand, the District Court decreed, insofar as relevant here: (1) that the Patrol and Department temporarily be required to offer appointment or employment first to every black applicant who meets the minimal qualifications determined to be valid by the District Court; and (2) that the plaintiffs were not entitled to attorney's fees nor taxable court costs. Morrow v. Dillard, 412 F.Supp. 494, 502, 507 (S.D.Miss.1976).
 
 
 8
 Appellants contend that the District Court erred in denying their attorney's fees and taxable court costs. Appellees, Cross-Appellants assert that the preferential hiring treatment ordered for minority applicants by the District Court is violative of the Fourteenth Amendment to the United States Constitution. Appellants additionally maintain that these issues have been decided, in varying degrees, by prior appeals in this Court, thereby precluding reconsideration of the attorney's fees issue by the District Court and the constitutionality of the affirmative hiring relief by this Court. For this reason, it is necessary to consider the doctrine of "law of the case" and determine its applicability, if any, to the case Sub judice.
 
 
 9
 II. THE DOCTRINE OF "LAW OF THE CASE"
 
 
 10
 The doctrine of "law of the case" is a rule of practice under which a rule of law enunciated by a federal court "not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but (also) establishes the law which other courts owing obedience to it Must, and which it itself will, normally, apply to the same issues in subsequent proceedings in the same case." 1B Moore's Federal Practice P 0.404(1) (2d ed. 1974) (footnotes omitted, emphasis in original). The doctrine is "based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." United States v. United States Smelting Refining & Mining Co., 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950); Fontainebleau Hotel Corp. v. Crossman, 286 F.2d 926, 928 (5th Cir. 1961).
 
 
 11
 The leading and controlling Fifth Circuit case on the doctrine is White v. Murtha, 377 F.2d 428 (5th Cir. 1967), in which the Court said:
 
 
 12
 The "law of the case" rule is based on the salutary and sound public policy that litigation should come to an end. It is predicated on the premise that "there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions or speculate of chances from changes in its membership," and that it would be impossible for an appellate court "to perform its duties satisfactorily and efficiently" and expeditiously "if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal" thereof.
 
 
 13
 While the "law of the case" doctrine is not an inexorable command, a decision of a legal issue or issues by an appellate court establishes the "law of the case" and must be followed in all subsequent proceedings in the same case in the trial court or on a latter appeal in the appellate court, Unless (1) the evidence on a subsequent trial was substantially different, (2) controlling authority has since made a contrary decision of the law applicable to such issues, or (3) the decision was clearly erroneous and would work manifest injustice.
 
 
 14
 377 F.2d at 431-32 (emphasis added, footnotes omitted). See also Schwartz v. NMS Industries, Inc., 575 F.2d 553, 554-55 (5th Cir. 1978); Carpa, Inc. v. Ward Foods, Inc., 567 F.2d 1316, 1319 (5th Cir. 1978); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 19 (5th Cir. 1974).
 
 
 15
 The doctrine's reach is not as expansive as the rule of res judicata: the doctrine of "law of the case" is limited insofar as it applies only to issues that were decided in the former proceeding but not to questions which might have been decided but were not. Carpa, Inc. v. Ward Foods, Inc., 567 F.2d at 1320; Terrell v. Household Goods Carriers' Bureau, 494 F.2d at 19. Nevertheless, "the doctrine does mean that the duty of a lower court to follow what has been decided at an earlier stage of the case comprehends things Decided by necessary implication as well as those decided explicitly." Carpa, Inc. v. Ward Foods, Inc., 567 F.2d at 1320 (emphasis in original). See also Terrell v. Household Goods Carriers' Bureau, 494 F.2d at 19. Therefore, the decisions of law made by the En banc Court in Morrow v. Crisler, 491 F.2d 1053 (5th Cir.), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974), were controlling not only on the trial court but are also controlling on this Court on this appeal. See Diplomat Electric Inc. v. Westinghouse Electric Supply Co., 430 F.2d 38, 48 (5th Cir. 1970) (decisions of law made on former appeal control trial court and appellate court, except as to clearly erroneous legal decision). See also Hodgson v. Brookhaven General Hospital, 470 F.2d 729, 730 (5th Cir. 1972) (prior appeal established law of the case which district court, on remand, bound to follow); Gulf Coast Building & Supply Co. v. International Brotherhood of Electrical Workers, Local No. 480, 460 F.2d 105, 107 (5th Cir. 1972) (whatever before appellate court and disposed of by decree becomes law of the case); Gorsalitz v. Olin Mathieson Chemical Corp., 456 F.2d 180, 181 (5th Cir. 1972) (question cannot be relitigated on appeal where settled by the law of the case of a prior appeal).
 
 
 16
 In determining the scope of the doctrine of "law of the case" on this appeal there are two basic questions that must be addressed: (1) What issues, if any, were decided, Either expressly or by implication, by the En banc Court's decision which the parties now raise on this appeal; and (2) Whether any of the exceptions delineated in White v. Murtha are available and permit reconsideration of an issue previously decided?
 
 III. AFFIRMATIVE HIRING RELIEF
 
 17
 Plaintiffs contend that defendants are foreclosed from challenging the constitutionality of the affirmative hiring relief ordered by the District Court. Under the doctrine of "law of the case," plaintiffs assert, this issue was decided when the En banc Court rejected defendants' argument that the affirmative relief sought by plaintiffs would constitute an unconstitutional preference. The question remains whether the En banc Court, Expressly or by implication, decided this issue.
 
 
 18
 There is no doubt that the parties had raised the issue of whether the affirmative hiring relief sought by plaintiffs was constitutional.[8] The majority opinion of the En banc Court, per Judge Gewin, did not Expressly decide whether the affirmative hiring relief sought by plaintiffs was constitutional. The Court merely decided "that the case should have been and must now be remanded for the District Court, in the first instance, to fashion an appropriate decree which will have the certain result of increasing the number of blacks on the Highway Patrol." 491 F.2d at 1055. Thereafter, the Court saw fit to adumbrate guidelines to aid the District Court on remand.
 
 
 19
 Beyond insuring that objective hiring criteria are utilized, it will be incumbent (up)on the District Court to order some affirmative hiring relief. It may, within the bounds of discretion, order Temporary one-to-one or one-to-two hiring, the creation of hiring pools, or a freeze on white hiring, or any other form of affirmative hiring relief until the Patrol is effectively integrated.
 
 
 20
 491 F.2d at 1056 (emphasis in original). To reiterate, nowhere does the Court expressly affirm the constitutionality of affirmative hiring relief; however, this issue must be deemed to have been decided Impliedly in light of Judge Clark's concurring and Judge Gee's dissenting opinions.
 
 
 21
 Judge Clark, in a special concurrence, noted that no court had ever adequately rationalized the constitutional infirmities inherent in requiring affirmative hiring practices and that he would have opted for a different course than the majority of the En banc Court if precedent did not compel concurrence. 491 F.2d at 1058-60 (Clark, J., concurring). Judge Gee's dissent indicated that he was "unable to concur in the (majority) opinion's approval of racial hiring quotas or a freeze on white hiring as remedies appropriate for application by the district court. That they would be effective is plain. That they are constitutional . . . (is) less so." 491 F.2d at 1064 (Gee, J., dissenting).
 
 
 22
 Considering the issues raised by the parties and amici curiae, as well as the basis for the concurring and dissenting opinions, we must logically conclude that the En banc Court necessarily must have decided, if only by implication, that the affirmative hiring relief mandated was constitutional. That conclusion is binding on this Court as the law of the case unless any of the exceptions to the doctrine are apposite.
 
 
 23
 As indicated above, the doctrine of "law of the case," precluding relitigation or reconsideration of issues of law previously decided, is subject to three exceptions: (1) where a subsequent trial produces substantially different evidence; (2) where controlling authority has made a contrary decision of the law applicable to such issues; and (3) where the prior decision was clearly erroneous and would work manifest injustice. White v. Murtha, 377 F.2d 428, 432 (5th Cir. 1967). See also Schwartz v. NMS Industries, Inc., 575 F.2d 553, 554-55 (5th Cir. 1978); Carpa, Inc. v. Ward Foods, Inc., 567 F.2d 1316, 1319 (5th Cir. 1978); Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 19 (5th Cir. 1974).
 
 
 24
 The first and third exceptions are clearly not applicable. Hearings conducted by the District Court on remand from the En banc Court did not produce any new and substantially different evidence with respect to defendants' hiring and employment practices. The En banc decision was not clearly erroneous, but in accord with the great weight of authority. See Morrow v. Crisler, 491 F.2d 1053, 1057-58 (5th Cir. 1974) (Brown, C. J., concurring). Finally, defendants have not demonstrated that manifest injustice would result. Consequently the doctrine of "law of the case" compels this Court to affirm the hiring relief ordered unless a controlling authority has made a contrary decision of law on the constitutionality of affirmative hiring relief Or the District Court abused its discretion in formulating its decree. The United States Supreme Court's recent decision in Regents of the University of California v. Bakke, --- U.S. ----, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), is not a Contrary decision of the law applicable to the issue herein raised.
 
 
 25
 Allan Bakke was a white male who had been denied admission to the Medical School of the University of California at Davis. Each of Bakke's two unsuccessful applications, made in 1973 and 1974, were considered under a general admissions program, a procedure separate from and coordinate to a faculty-devised special admissions program for disadvantaged and minority applicants. Bakke's "benchmark" score, a cumulative rating consisting of interviewers' summaries, overall and science course grade point averages, MCAT scores, letters of recommendation, extracurricular activities and other biographical data, was higher than those scores of some special candidates admitted to the medical school. The medical school admission program was challenged as a denial of Bakke's rights under the Equal Protection Clause of the Fourteenth Amendment, Article I, section 21 of the California Constitution, and section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Bakke alleged that the special admissions program violated his rights because it operated to exclude him from the school on the basis of race.
 
 
 26
 The United States Supreme Court held: (1) that race may be taken into account as a factor in an admissions program; (2) that Title VI proscribes only those racial classifications that would violate the equal protection concept inherent in the Fifth Amendment's Due Process Clause; and (3) that Allan Bakke was entitled to be admitted to the Medical School at the University of California at Davis because of the unique nature of the special admissions program conducted at that school.[9]
 
 
 27
 Justice Powell rejected semantic distinctions in characterizing the special admissions program. Whether the program was best characterized as a "racial quota" or as establishing a "goal" of minority representation in the medical school, it was undeniably a classification based on race and ethnic background and, therefore, subject to the most exacting judicial examination. --- U.S. at ----, 98 S.Ct. at 2747-49. Justice Powell said that "(t)he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color. If both are not accorded the same protection, then it is not equal." --- U.S. at ----, 98 S.Ct. at 2748. He continued by saying that "(i)t is far too late to argue that the guarantee of equal protection to All persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others." --- U.S. at ----, 98 S.Ct. at 2751 (emphasis in original, footnote omitted).
 
 
 28
 The medical school had contended that on several occasions the Court had approved preferential classifications without applying the most exacting scrutiny. Justice Powell emphasized that the cases cited, drawn from the areas of school desegregation, employment discrimination and sex discrimination, were materially different from the facts presented in Bakke.
 
 
 29
 Justice Powell found the school desegregation cases inapposite in that each involved racial classifications designed as remedies for the vindication of constitutional rights after a judicial determination of a constitutional violation. --- U.S. at ----, 98 S.Ct. at 2754. Employment discrimination cases involving racial preferences as remedies for constitutional or statutory violations were also distinguishable on that ground. See, e. g., Bridgeport Guardians, Inc. v. Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), Cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); Carter v. Gallagher, 452 F.2d 315 (8th Cir.), Modified on rehearing en banc, 452 F.2d 327 (8th Cir.), Cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).
 
 
 30
 Justice Powell went on to determine whether the suspect racial classification employed by the medical school could be justified by a constitutionally permissible and substantial purpose that was necessary to the accomplishment of that purpose. --- U.S. at ----, 98 S.Ct. at 2756-57. In the course of discussing the school's purpose of countering the effects of social discrimination, Justice Powell said:
 
 
 31
 We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. . . . After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the victims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit. Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm.
 
 
 32
 --- U.S. at ----, 98 S.Ct. at 2757-58 (citations omitted).[10]
 
 
 33
 This approach is consistent with the Court's long-standing principle that the federal courts' equitable powers embrace decrees designed to "eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). In exercising their remedial equitable powers federal courts may consider race. See North Carolina Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). As the Supreme Court said in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):
 
 
 34
 Once a right and violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
 
 
 35
 The task is to correct, by balancing of the individual and collective interests, the condition that offends the Constitution.
 
 
 36
 As with any equity case, the nature of the violation determines the scope of the remedy.
 
 
 37
 A district court's remedial decree must be reasonable, feasible, workable, effective and realistic. 402 U.S. at 31, 91 S.Ct. at 1283.
 
 
 38
 The Bakke decision should not be viewed as a Contrary decision of law applicable to the issue of the constitutionality of affirmative hiring relief, but as a decision reaffirming the equitable power of federal courts to remedy the effects of unconstitutional acts through race-conscious means. Consequently, there being no applicable exception to the doctrine of "law of the case," the En banc Court's decision in Morrow v. Crisler must be deemed the law of the case. This Court, therefore, is precluded from reconsidering the constitutionality of the relief mandated by the En banc opinion. One question remains before the District Court's affirmative hiring decree can be affirmed, and that is whether the court abused its discretion in devising the particular remedy challenged on the cross-appeal.
 
 
 39
 The District Court decree specifically tracked a suggestion made by Judge Roney in a concurrence[11] to the En banc decision.
 
 
 40
 As suggested by Judges Roney, Bell and Ainsworth in their specially concurring opinion, when hiring future employees or officers, the (Patrol) shall be temporarily required to first offer appointment to every black applicant who meets the minimal qualifications which this Court has determined to be valid, i. e. (1) passes the approved tests, (2) meets the statutory educational requirement, (3) passes the physical examination and successfully completes training school, (4) passes the Patrol's standardized background investigation. This requirement shall remain in effect until this Court, upon appropriate motion, determines that a sufficient number of blacks have been appointed to overcome the effects of the past discriminatory employment practices of the Patrol.
 
 
 41
 Morrow v. Dillard, 412 F.Supp. 494, 502 (S.D.Miss.1976).[12] One member of the En banc Court expressly found that Judge Roney's suggestion of preferential hiring was "obviously encompassed in the majority's 'affirmative hiring relief.' " 491 F.2d at 1060 (Clark, J., concurring).
 
 
 42
 Not only was the District Court's decree encompassed in the En banc Court's affirmative hiring relief, it also was consistent with this Court's decision in NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974).
 
 
 43
 NAACP v. Allen was a class action brought against the Director of the Alabama Department of Public Safety, which unconstitutionally excluded negroes from employment. The district court had found that the Department was guilty of discriminatory practices at each stage of the employment selection process. In thirty-seven years of the Alabama Highway Patrol's history it had never had a black trooper and the only negroes employed had been laborers. The district court exercised its discretion in granting both mandatory and prohibitory injunctive relief as a means of ending racial discrimination in the patrol's employment policies and beginning eradication of its lingering effects. The Department was ordered to begin statewide recruitment and equal opportunity advertising programs directed especially at blacks. In addition, the district court affirmatively required the hiring and permanent employment of one qualified black trooper or support person for each white so hired until approximately twenty-five percent of both the state trooper and support personnel force was comprised of blacks. On appeal, defendants contended that the quota hiring relief granted was an unconstitutional discrimination against eligible white applicants, thereby substituting one constitutional infirmity for another. The Court squarely addressed the issue of the constitutionality of quota-based affirmative hiring relief.
 
 
 44
 Presuming further, that the federal chancellor's discretion should be subjected to the stringent compelling governmental interest test, the decree passes constitutional muster. No one is denied any right conferred by the Constitution. It is the collective interest, governmental as well as social, in effectively ending unconstitutional racial discrimination, that justifies temporary, carefully circumscribed resort to racial criteria, whenever the chancellor determines that it represents the only rational, nonarbitrary means of eradicating (the) past evils.
 
 
 45
 493 F.2d at 619 (footnote omitted). The Court also held that "appellate review of quota hiring is limited to whether the imposition of such relief in a given situation constitutes an abuse of the federal chancellor's discretion." 493 F.2d at 620.[13]
 
 
 46
 The relief ordered by the District Court in this case is far less restrictive than the quota-based relief approved by the Court in NAACP v. Allen : neither underqualified nor nonqualified blacks will be employed nor will there be a freeze on hiring. The affirmative hiring relief ordered by the District Court is necessary to eliminate the hiring discrimination practiced by defendants: the first appeal of this case demonstrated that a mere injunction against continued hiring discrimination was not effective.[14]
 
 
 47
 The relief ordered by the District Court is necessary "to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices." NAACP v. Allen, 493 F.2d 614, 621 (5th Cir. 1974).
 
 
 48
 The doctrine of "law of the case" forestalls our reconsideration of the constitutionality of the affirmative hiring relief ordered by the District Court and compels affirmance of that portion of the District Court's decree. Even if this issue were presented to this panel de novo, however, the Constitution[15] and the weight of precedent[16] would require our affirmance.
 
 IV. ATTORNEY'S FEES AND COSTS
 
 49
 The District Court, in its original decree, had taxed all taxable costs against defendants and ordered defendants to pay plaintiffs attorney's fees in the amount of $500. The District Court furnished no reasons for its award of costs and fees. Morrow v. Crisler, 4 Empl.Prac.Dec. (CCH) P 7563, at 5244 (S.D.Miss.1971); (R. 458). Plaintiffs moved the District Court to amend the judgment and reassess the amount of the attorney's fee award. They sought to increase the award from $500 to $6,060, based on the amount of hours of attorney services performed and the standard rate for legal fees then prevailing in Jackson, Mississippi. (R. 471-88). The District Court thereafter ordered that reasonable attorney's fees assessed against defendants and payable to plaintiffs would be $3,000. In so doing, the District Court stated that it had considered the time spent by counsel in preparing the case, the average rate per hour in civil cases, and the finding by the court that the named plaintiffs failed to prove conscious or intentional discrimination on the part of the defendants. 4 Empl.Prac.Dec. (CCH) P 7585, at 5329; (R. 892-93).
 
 
 50
 On the first appeal to this Court, plaintiffs contended that the District Court erred in failing to grant attorney's fees at the rate requested by plaintiffs. Morrow v. Crisler, No. 72-1136, Brief for Appellants, at 44-48. Defendants asserted that the District Court had abused its discretion and erred in granting attorney's fees where the defendants had not acted in bad faith. Morrow v. Crisler, No. 72-1136, Brief for Appellees, Cross-Appellants, at 49-54. Defendants did not raise the bar of the Eleventh Amendment with respect to attorney's fees or costs, but did contend that they were Wholly immune from suit under the Eleventh Amendment. Id. at 23-28.
 
 
 51
 The original panel opinion was silent on the issue of attorney's fees. The En banc Court, however, ordered the District Court on remand to "reconsider the award of the Amount of the attorney's fees, and . . . award such fees as may be appropriate for this appeal and further proceedings." 491 F.2d at 1057 (emphasis added).
 
 On remand, the District Court said:
 
 52
 The defendants have from the inception of this case contended that the Eleventh Amendment bars the award of attorneys' fees against an unconsenting state and state officials acting in their official capacities, and at the first full hearing held subsequent to remand, this Court, pursuant to the request of the defendants, held in abeyance any decision concerning the award of attorneys' fees until there had been a resolution of the immunity question by the United States Supreme Court or by the en banc Fifth Circuit.
 
 
 53
 Although this Court has some reservation(s) concerning its jurisdiction to now reconsider its previous award of attorneys' fees, since it does have continuing jurisdiction of this cause of action pursuant to the remand of the Fifth Circuit, we now consider and find that the plaintiffs are not entitled to recover any attorneys' fees from the defendants or any of them, inasmuch as our award of attorneys' fees (wherever attorneys' fees is referred to herein it also includes costs) was made solely on the basis of the "private attorney general" theory which was the rule of the Fifth Circuit at that time and prior to the United States Supreme Court's opinion in Alyeska Pipeline Service v. Wilderness Society, et al., 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).
 
 
 54
 412 F.Supp. at 507. The District Court, even if bound by the doctrine of "law of the case" as discussed above, properly reconsidered its prior award of attorney's fees because of the intervening decision of the United States Supreme Court in Alyeska. The District Court correctly read Alyeska as prohibiting the award of attorney's fees to prevailing parties unless there was a contract between the parties, a specific statute authorized attorney's fees, the losing party had acted in bad faith or in wilfull disobedience to a court's order, or the "common fund" theory applied. See Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 257-58, 95 S.Ct. 1612, 1621-22, 44 L.Ed.2d 141 (1975). Finding none of these exceptions present, and that defendants had not acted in bad faith, the District Court denied all attorney's fees And costs. Even assuming there was bad faith, the District Court also found that the Eleventh Amendment barred the award of fees or costs. 412 F.Supp. 507-508.
 
 
 55
 The Civil Rights Attorney's Fee Awards Act of 1976, Codified at 42 U.S.C. § 1988, and the United States Supreme Court's decision in Hutto v. Finney, --- U.S. ----, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), require reversal of the District Court's order denying attorney's fees and costs.
 
 
 56
 The Civil Rights Attorney's Fee Awards Act of 1976 provides, in pertinent part, as follows:
 
 
 57
 In Any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title . . . or title VI of the Civil Rights Act of 1964, the court, In its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee As part of the costs.
 
 
 58
 42 U.S.C. § 1988 (emphasis added).
 
 
 59
 In Hutto, the district court had entered a series of detailed remedial orders after finding that conditions in the Arkansas penal system constituted cruel and unusual punishment. On appeal, the Eighth Circuit affirmed an order placing a maximum of thirty days on confinement in punitive isolation and an award of attorney's fees to be paid out of the Department of Corrections' funds. The district court had made an express finding of bad faith by correctional authorities in awarding $20,000 attorney's fees. The Eighth Circuit's affirmance and assessment of $2,500 additional fees to cover the fees and expenses of appeal were made chiefly in reliance on the Civil Rights Attorney's Fee Awards Act. Alternatively, the court noted that the award was justified under the bad faith exception to Alyeska. See --- U.S. at ---- n.13, 98 S.Ct. at 2573 n.13. Before the United States Supreme Court, the Attorney General of Arkansas argued that the court order requiring attorney's fees to be paid from public funds was violative of the Eleventh Amendment.
 
 
 60
 Affirming the Eighth Circuit's award of attorney's fees, the Supreme Court's analysis was bifurcated, treating the trial fees and appeal fees separately. With regard to the fees and costs generated at trial the Court said:
 
 
 61
 In this case, the award of attorney's fees for bad faith served the same purpose as a remedial fine imposed for civil contempt. It vindicated the District Court's authority over a recalcitrant litigant. Compensation was not the sole motive for the award; in setting the amount of the fee the court said that it would "make no effort to adequately compensate counsel for the work that they have done or for the time that they have spent on the case." . . . The court did allow a "substantial" fee, however, because "the allowance thereof may incline the Department to act in such a manner that further protracted litigation about the prisons will not be necessary." . . . We see no reason to distinguish this award from any other penalty imposed to enforce a prospective injunction. Hence the substantive protections of the Eleventh Amendment do not prevent an award of attorney's fees against the Department's officers in their official capacities.
 
 
 62
 --- U.S. at ----, 98 S.Ct. at 2574 (citations omitted).
 
 
 63
 An express finding of bad faith, however, is not necessary for an award of attorney's fees in this case. Hutto merely holds that where a state officer is guilty of bad faith, the Eleventh Amendment affords no protection against an award of attorney's fees. Hutto further holds that the Civil Rights Attorney's Fee Awards Act surmounts the barrier imposed by the Eleventh Amendment and permits prevailing parties in actions brought under statutes enumerated in the Act to recover attorney's fees from state officers acting in their official capacities As part of costs.[17] --- U.S. at ----, 98 S.Ct. at 2575-79.
 
 
 64
 The Court reasoned that under Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), Congress has the plenary power to set aside the States' immunity from retroactive relief in order to enforce the Fourteenth Amendment. This power was exercised when Congress enacted the Civil Rights Attorney's Fee Awards Act, thereby authorizing fee awards payable by the States when their officials were sued in their official capacities. The Act, pertaining to Any suit brought under the statutes enumerated therein, contained no hint of an exception for States defending injunction actions. Not only did the Act apply primarily to laws passed specifically to restrain state action, e. g. 42 U.S.C. § 1983, but the Act's legislative history clearly indicated fees were recoverable from State funds.[18]
 
 
 65
 The legislative history of the Act also indicated that Congress intended the new legislation to be directly applicable to this case, and cases of this sort.
 
 
 66
 Mr. FISH. Mr. Speaker, the civil rights attorney's fees bill, S. 2278, would allow a court, at its discretion, to award attorney's fees to a prevailing party in suits brought to enforce the civil rights laws. The purpose of the bill is to allow the courts to provide the traditional remedy of counsel fee awards to private citizens who must go to court to vindicate their rights under the civil rights statutes.
 
 
 67
 The Supreme Court's recent Alyeska decision requires specific statutory authority for attorney's fee awards. This bill restores to the courts authority which they had exercised for years under the private attorneys general concept. It fills the gap in the civil rights laws under which attorney's fees have become unavailable in the most fundamental civil rights cases.
 
 
 68
 The average citizen does not have the financial resources to bring suit to enforce his rights unless attorney's fees are awarded. This bill should be passed in order to provide more effective enforcement of the civil rights laws.
 
 
 69
 Without the provision of attorney's fees, it would be very difficult to bring cases such as the following:
 
 
 70
 Third. Suits under section 1979 of the Revised Statutes, by blacks denied employment by the State highway patrol on the basis of race, Morrow v. Crisler (S.D.Miss., Sept. 29, 1971).
 
 
 71
 122 Cong.Rec. H12163 (daily ed. Oct. 1, 1976) (remarks of Rep. Fish).
 
 
 72
 The essence of the Court's opinion in Hutto is its reliance upon the long-established practice of awarding costs against State litigants and its emphasis upon Congress' power to include attorney's fees within the definition of costs.
 
 
 73
 The (Civil Rights Attorney's Fee Awards) Act imposes attorney's fees "as a part of the costs." Costs have traditionally been awarded without regard for the States' Eleventh Amendment immunity. The practice of awarding costs against the States goes back to 1849 in this Court. . . . The Court has never viewed the Eleventh Amendment as barring such awards, even in suits between States and individual litigants.
 
 
 74
 --- U.S. at ----, 98 S.Ct. at 2576 (footnotes & citations omitted).
 
 
 75
 Finally, Hutto reaffirmed the position taken by numerous courts[19] that the Civil Rights Attorney's Fee Awards Act applies to cases pending at the time the Act went into effect. --- U.S. at ---- n.23, 98 S.Ct. at 2576 n.23.
 
 
 76
 Since the Eleventh Amendment is not a bar to an award of attorney's fees Or costs[20] against defendants in the case Sub judice, we must consider whether plaintiffs are entitled to an award under the circumstances of this case.
 
 
 77
 The language of the Act itself unequivocally and expressly makes the award of fees a question of discretion for the court. Its judgment should be reversed only for an abuse of discretion. Sandford v. R. L. Coleman Realty Co., 573 F.2d 173, 179 (4th Cir. 1978). Nonetheless, a prevailing party should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust. Henderson v. Fort Worth Independent School District, 574 F.2d 1210, 1212 (5th Cir. 1978); S.Rep.No. 94-1011, 94th Cong., 2d Sess. 5, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 5908, 5912; Accord Perez v. Rodriguez Bou, 575 F.2d 21, 24 (1st Cir. 1978); Green v. Ten Eyck, 572 F.2d 1233, 1243 (8th Cir. 1978); Cf. Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).
 
 
 78
 The prevailing party is entitled to fees for appeal as well as those incurred during proceedings at the trial level. Miller v. Carson, 563 F.2d 741, 756 (5th Cir. 1977); Gore v. Turner, 563 F.2d 159, 163 (5th Cir. 1977). There need be no finding of bad faith, Gates v. Collier, 559 F.2d 241, 242 (5th Cir. 1977), nor must the defendants be guilty of intentional discrimination for liability to exist. Brown v. Culpepper, 559 F.2d 274, 278 (5th Cir. 1977).
 
 
 79
 On remand, then, the District Court is to award plaintiffs costs and attorney's fees for all proceedings of this case at both the trial and appellate levels. In making its assessment of attorney's fees, the District Court should consider the factors enunciated by this Court in Rainey v. Jackson State College, 551 F.2d 672, 676 (5th Cir. 1977):
 
 
 80
 (1) the time and labor required;
 
 
 81
 (2) the skill requisite to properly perform the legal services;
 
 
 82
 (3) (the) preclusion of other employment by the attorney due to acceptance of the case;
 
 
 83
 (4) the novelty and difficulty of the questions presented;
 
 
 84
 (5) the customary fee;
 
 
 85
 (6) whether the fee is fixed or contingent;
 
 
 86
 (7) time limitations imposed by the client;
 
 
 87
 (8) the amount involved and the results obtained;
 
 
 88
 (9) the experience, reputation and ability of the attorneys;
 
 
 89
 (10) the undesirability of the case;
 
 
 90
 (11) the nature and length of the professional relationship with the client; and
 
 
 91
 (12) awards in similar cases.
 
 
 92
 Although the record time spent by counsel is not a talisman, it must be given real consideration. Id. at 677. On remand, the District Court should make an express finding of record setting forth the basis of its award of attorneys' fees and stating the particular factors relied upon.
 
 
 93
 The judgment of the District Court as to attorneys' fees and costs is REVERSED and the case is REMANDED for the further proceedings directed by this opinion. With respect to the cross-appeal, the judgment of the District Court is AFFIRMED.
 
 
 94
 Taxable costs of this appeal and cross-appeal shall be assessed by the Clerk of this Court against the appellees.
 
 
 95
 REVERSED and REMANDED in part, with instructions; AFFIRMED in part.
 
 
 
 [1]
 In particular, plaintiffs alleged that defendants had discriminated against them and members of the class by: (a) failing and refusing to permit them to apply for staff positions with the Department solely because of race or color; (b) failing and refusing to hire and train them for staff positions in the Department solely because of their race or color; (c) maintaining certain departments, divisions, and bureaus within the Department for whites only and others for negroes only; (d) failing and refusing to promote negroes to positions of higher responsibility and benefits or to supervisory positions solely because of their race or color; (e) failing and refusing to prohibit the use of racial terms and epithets which are humiliating, derogatory and insulting to members of the negro race by staff persons and officers; and (f) otherwise applying terms and conditions of employment within the Department in a racially discriminatory manner. Morrow v. Crisler, 4 Empl.Prac.Dec. (CCH) P 7563, at 5234-35 (S.D.Miss.1971), (R. 6-7)
 
 
 [2]
 Section 1981 provides:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 [3]
 Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [4]
 Section 2000d provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 [5]
 Pursuant to F.R.Civ.P. 52(a), the District Court entered its findings of fact which included, Inter alia, the following:
 "14. According to the 1960 United States Census, the population of the State of Mississippi was 42% Black, and according to the 1970 Census the population of the State is 36.7% Black. The Mississippi Highway Patrol has never in its history employed a member of the Negro race as a sworn officer (patrolman).
 
 
 [15]
 As of April 15, 1971, of the 27 bureaus within the Department of Public Safety, only two, the Maintenance Bureau and the Training Academy, had any Black employees and these consisted of cooks at the Training Academy and janitors in the Maintenance Bureau. The employees of all the other bureaus within the Department, including clerical and secretarial personnel and sworn officers were White. Of the Department's 743 employees, 17 are Black and this has been the case since 1968. The Mississippi Highway Patrol has never in its history employed a Black as a sworn officer. Since January 1, 1968, 197 persons, all White, have been hired as Mississippi Highway Patrolmen
 
 
 [16]
 Although the defendants denied the charge that they maintained any racially discriminatory hiring or employment policies, no explanation was given by them for the all-White composition of the sworn officers of the Patrol
 
 
 [19]
 Two tests are required of applicants for positions of sworn officers with the Patrol, the Otis Quick Scoring Mental Ability Test and an oral spelling test of which no record is kept. Both of these tests are administered and graded by Snodgrass (the personnel officer), and neither has been validated to determine whether there is a significant correlation between high scores on the test and good performance as a patrolman
 
 
 [21]
 Neither the Department of Public Safety nor the Highway Safety Patrol does any public advertising or makes any public announcements when job vacancies become available. Most of the patrolmen presently employed by the Patrol learned of the vacancies and the fact that applications were being accepted through word-of-mouth inquiry from patrolmen who are their friends or relatives, and the majority of the clerical positions in the Department are filled by walk-ins, many of whom are recommended by present employees
 
 
 [22]
 The employment application forms utilized by the Department and the patrol require an applicant to list his relatives employed by the State of Mississippi or acquaintances employed by the Patrol. Of the 107 Whites hired as patrolman since January 1, 1968, all but twelve listed friends or acquaintances employed by the Patrol, and forty-two listed relatives employed by the State of Mississippi. Although there are communication media in the State of Mississippi, including television, radio and newspapers which reach a large portion of the Black community, neither the Department nor the Patrol has advertised the availability of jobs in any of these media or in any other news media in the State of Mississippi. The officers of the Public Relations Bureau of the Department present recruitment programs, including speeches, to civic clubs, church groups and student groups throughout the State. Included in these programs are presentations on "the law enforcement profession" which include a description of the employment opportunities and qualifications for positions with the Department and the Patrol. The audiences for such programs have been predominantly White. A color motion picture film, apparently produced prior to January 1, 1968, which shows the physical plant and training operations of the Training Academy, has been available at the Patrol's public relations bureau and has been shown to groups of students as part of "career day" programs in schools in the State. In this film, which at the time of the trial of this case had been ordered by Commissioner Crisler not to be shown again, all of the recruits, officers, instructors, Academy personnel and other persons are White, with the exception of Black cooks and food servers in the cafeteria
 
 
 [23]
 Until shortly before the trial of this case, the Department had no written rules or regulations prohibiting the use of racial terms or epithets by patrolmen, and the term "nigger" had at times been used by patrolmen in addressing Blacks. The use of such racial epithets by patrolmen has now been prohibited by written regulation of the Patrol
 
 
 [24]
 The Mississippi Department of Public Safety and the Mississippi Highway Safety Patrol have had a reputation throughout the State of Mississippi, and particularly among the Black communities, as being an all-White Department and Patrol, which has discouraged Blacks, with the exception of the two named plaintiffs, Coker and probably only a few others, from applying for membership, particularly as sworn officers of the Patrol, by virtue of that fact that there have never been any Black sworn officers on the Patrol. This in part has resulted from the fact that the application forms provide for a listing of relatives employed by the State of Mississippi and friends and acquaintances on the Patrol and within the Department of Public Safety, the former being all-White and the latter being almost all-White. Favoritism and partiality have been shown to those applicants having relatives, friends and acquaintances on the all-White Patrol."
 
 
 [4]
 Empl.Prac.Dec. (CCH) P 7563, at 5238-40, (R. 439-45) (footnotes omitted)
 
 
 [6]
 The court enjoined the defendants from: (a) racial discrimination in the distribution, receipt, and processing of all applications for employment within the Department; (b) continuing, maintaining or instituting any of nine specified racially discriminatory practices, including the requirement of passing any tests which had neither been validated nor proved to be significantly related to successful job performance; (c) applying for the next five years any standards or conditions more stringent than those previously applied that would make it more difficult for new employees to be hired; (d) giving preference to applicants who have relatives in the Department; and (e) using recruitment films which imply that responsible positions are open to or held by whites only. 4 Empl.Prac.Dec. (CCH) P 7541, at 5164-67, (R. 460-65)
 
 
 [7]
 The decree also required the defendants to: (a) comply with the rules and regulations prohibiting the use of any racial terms and epithets which are humiliating, derogatory or insulting to anyone because of their race, color, creed, or national origin; and (b) maintain records and make reports as to the race of all applicants, employees, hirings, promotions, demotions, and discharges for a three to five years period. Id
 
 
 [8]
 In the first appeal to this Court, defendants had maintained that the affirmative hiring quota-based relief sought by plaintiffs exceeded the needs made out by the statistics and would constitute an unconstitutional absolute preference. Morrow v. Crisler, No. 72-1136, Brief For Appellees, Cross-Appellants, at 29-38
 After the original panel decision, plaintiffs asserted that not only were affirmative hiring goals for minorities constitutional, but that they were constitutionally required. Morrow v. Crisler, No. 72-1136, Supplemental Brief For Appellants on Rehearing En Banc, at 9-13, 16-21.
 The issue was also raised by two amici curiae. See Morrow v. Crisler, No. 72-1136, Memorandum for the United States as Amicus Curiae in Support of Appellant's Petition for Rehearing and Suggestion for Rehearing En Banc, at 7-10 ("there is no constitutional infirmity to the ordering of affirmative hiring goals for minorities"); Morrow v. Crisler, No. 72-1136, Amicus Curiae Brief of William J. Baxley, Attorney General of Alabama, at 2 ("Any system which requires that considerations of relative abilities and qualifications be subordinated to considerations of race, religion, sex or national origin in determining who is to be hired, promoted, etc., in order to achieve a certain numerical position has the attributes of a quota system and is unconstitutional.").
 
 
 [9]
 Justice Powell, announcing the judgment for the Court, found that the principal evil of the special admissions program was the denial to Bakke of his right to individualized consideration without regard to race: special candidates were considered separately from non-minority applicants and were guaranteed a specified number of seats in each class. This amounted to a denial of Bakke's rights under the Equal Protection Clause. However, the majority which found that Bakke was entitled to admission consisted of Chief Justice Burger, Justices Stevens, Stewart, and Rehnquist, as well as Justice Powell. This majority, other than Justice Powell, did not reach the constitutional issue, but based its decision on section 601 of the Civil Rights Act of 1964. The Court's holding on the constitutionality of race as a factor in an admissions program devolved from a majority consisting of Justices Powell, Brennan, White, Marshall, and Blackmun
 
 
 [10]
 The opinion of Justices Brennan, White, Marshall, and Blackmun began by announcing the central meaning of the Bakke decision as the following: "Government may take race into account when it acts not to demean or insult any racial group, but to remedy disadvantages cast on minorities by past racial prejudice, at least when appropriate findings have been made by judicial, legislative, or administrative bodies with competence to act in this area." --- U.S. at ----, 98 S.Ct. at 2766
 Justice Stevens took exception to this characterization with the following rejoinder: "Four Members of the Court have undertaken to announce the legal and constitutional effect of this Court's judgment. . . . It is hardly necessary to state that only a majority can speak for the Court or determine what is the 'central meaning' of any judgment of the Court." --- U.S. at ---- n.1, 98 S.Ct. at 2809 n.1.
 Some confusion is also created by the Brennan-White-Marshall-Blackmun opinion. After adopting a position seemingly in agreement with Justice Powell's, the concurring and dissenting opinion repudiates Justice Powell's distinction.
 (The school desegregation, employment discrimination, and sex discrimination) cases cannot be distinguished simply by the presence of judicial findings of discrimination, for race-conscious remedies have been approved where such findings have not been made. . . . Indeed, the requirement of a judicial determination of a constitutional or statutory violation as a predicate for race-conscious remedial actions would be self-defeating. Such a requirement would severely undermine efforts to achieve voluntary compliance with the requirements of (the) law. And, our society and jurisprudence have always stressed the value of voluntary efforts to further the objectives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action.
 --- U.S. at ----, 98 S.Ct. at 2786-87 (footnote and citations omitted).
 
 
 [11]
 Judge Roney's suggestion took the following form:
 Until qualified blacks become available for employment, a hiring quota will either require employment of underqualified or nonqualified blacks or effect a freeze on hiring. Yet the majority disclaims any suggestion of hiring unqualified people. Moreover, an effective freeze on hiring could subvert the Patrol's primary purpose of protecting the public.
 A temporary requirement that the Patrol hire every black applicant who meets the minimal qualifications which the Court may finally determine to be valid would not invite such an adverse result. Relief of that nature might be in order until a sufficient number of blacks have been hired to overcome the effects of the past discriminatory employment practices on the Patrol.
 Morrow v. Crisler, 491 F.2d 1053, 1060 (5th Cir.) (Roney, J., concurring), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974).
 
 
 [12]
 The District Court's post-remand decree ordered similar affirmative relief against the Department of Public Safety with respect to hiring non-sworn clerical employees. Our affirmance of the district court's decree encompasses both non-sworn clerical employees and sworn employees (i. e. patrolmen)
 
 
 [13]
 The discretionary standard was expressly approved in the first appeal of this case. Morrow v. Crisler, 491 F.2d 1053, 1056 (5th Cir.) (en banc), Cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974)
 
 
 [14]
 The En banc Court clearly found that affirmative hiring relief was necessary
 Experience since the entry of the decree provides this Court on rehearing with the hindsight to determine what was fathomed by foresight in the dissent from the panel opinion: the relief ordered by the District Court is insufficient. When this case was heard by the original panel in June 1972, the Highway Patrol had four black patrolmen. By the time the case was heard by the En banc Court in October 1973, there were six black patrolmen six black patrolmen hired since entry of the decree during a period when 91 patrolmen were added to a total force of approximately 500 troopers.
 These figures alone negate the State's argument that its present practices are nondiscriminatory, and give no support whatsoever to any argument that the decree appealed from is sufficient to eliminate the effects of past racial discrimination. Although we have difficulty seeing how any good faith argument could be made that the State has fulfilled the spirit, intent, and purpose of the District Court decree, counsel reported at oral argument before the En banc Court that the Highway Patrol has fully complied with the precise terms of the order. This illuminates plaintiffs' argument that the District Court must order additional specific relief if the Mississippi Highway Patrol's employment practices are ever to pass constitutional muster.
 Morrow v. Crisler, 491 F.2d 1053, 1055 (5th Cir. 1974) (en banc).
 
 
 [15]
 "The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination." United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 876 (5th Cir. 1966) (Wisdom, J.), Aff'd on rehearing en banc, 380 F.2d 385 (5th Cir.), Cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967)
 
 
 [16]
 See, e. g., Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017, 1027 (1st Cir. 1974), Cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (minorities awarded hiring preference to ameliorate the effects of past discrimination); NAACP v. Allen, 493 F.2d 614 (5th Cir. 1974) (one-to-one hiring quota to remedy unlawful discrimination and eradicate its effects); Carter v. Gallagher, 452 F.2d 315, 330-31 (8th Cir.) (en banc), Cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (approving quota-based affirmative hiring relief for employment discrimination)
 
 
 [17]
 Prior to Hutto this Court had held that the Civil Rights Attorney's Fee Awards Act of 1976 established that the Eleventh Amendment was no longer a bar to the award of attorney's fees against a state in actions under the statutes enumerated in the Act. See Gates v. Collier, 559 F.2d 241, 243 (5th Cir. 1977); Rainey v. Jackson State College, 551 F.2d 672, 675 (5th Cir. 1977). Accord Martinez Rodriquez v. Jimenez, 551 F.2d 877, 879 (1st Cir. 1977)
 
 
 [18]
 The relevant legislative history is quite clear on this question
 (I)t is intended that the attorney's fees, like other items of costs, will be collected either directly from the official, in his official capacity, from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party). S.Rep.No. 94-1011, 94th Cong., 2d Sess. 5, Reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 5908, 5913 (footnotes omitted).
 The greater resources available to governments provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against government officials or entities. H.R.Rep.No. 94-1558, 94th Cong., 2d Sess. 7.
 The Senate Report contemplated that by defining fees as costs there would be no problem in awarding fees against State officers acting in their official capacities because of the award of costs against a state in Fairmont Creamery Co. v. Minnesota, 275 U.S. 70, 48 S.Ct. 97, 72 L.Ed. 168 (1928). See S.Rep.No. 94-1011, 94th Cong., 2d Sess. 5 n.6, Reprinted in, (1976) U.S.Code Cong. & Admin.News at 5913 n.6. The Senate Report also indicated that where a state official was guilty of bad faith, attorney's fees could be awarded against him in his private capacity under Alyeska. Id. at 5 n.7, Reprinted in, (1976) U.S.Code Cong. & Admin.News at 5913 n.7.
 
 
 [19]
 See, e. g., Perez v. Rodriguez Bou, 575 F.2d 21, 24 (1st Cir. 1978); Simpson v. Weeks, 570 F.2d 240, 244 (8th Cir. 1978), Petition for cert. filed, 46 U.S.L.W. 3666 (U.S. April 18, 1978) (No. 77-1481); Miller v. Carson, 563 F.2d 741, 754 (5th Cir. 1977); Gore v. Turner, 563 F.2d 159, 163 (5th Cir. 1977); Williams v. Anderson, 562 F.2d 1081, 1102 (8th Cir. 1977); Gates v. Collier, 559 F.2d 241, 243 (5th Cir. 1977); Hodge v. Seiler, 558 F.2d 284, 286 (5th Cir. 1977); Rainey v. Jackson State College, 551 F.2d 672, 675 & n.4 (5th Cir. 1977); Stanford Daily v. Zurcher, 550 F.2d 464, 466 (9th Cir. 1977), Aff'd on other grounds, --- U.S. ----, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)
 This Court has gone so far as to hold that the Act applies even where the only issue remaining unresolved at the time of the Act's effectiveness is attorney's fees. Rainey v. Jackson State College, 551 F.2d 672, 676 (5th Cir. 1977).
 
 
 [20]
 The Supreme Court's discussion in Hutto unmistakably affirms Fairmont Creamery to the extent that taxable court costs are recoverable from a State. See --- U.S. at ---- n.26, 98 S.Ct. at 2577 n.26 ("Fairmont Creamery has been widely understood as foreclosing any Eleventh Amendment objection to assessing costs against a State in all federal courts."). Hence, plaintiffs are entitled to recover their costs. Accord Samuel v. University of Pittsburgh, 538 F.2d 991, 999 (3d Cir. 1976) (Eleventh Amendment not a bar to recovery of costs from state university officials); Thonen v. Jenkins, 517 F.2d 3, 7-8 (4th Cir. 1975) (dictum, costs of litigation taxable against state despite Eleventh Amendment); Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017, 1029 (1st Cir. 1974), Cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975) (Eleventh Amendment does not immunize state civil service officials from being taxed for costs)